Estado Libre Asociado de Puerto Rico
**TRIBUNAL DE APELACIONES**
**PANEL VI**

| | | |
|---|---|---|
| Luna Residential III, LLC<br><br>　　Apelado<br><br>　　vs.<br><br>Jorge L. Hernández Miller, et al<br><br>　　Apelante | TA2025AP00609 | **APELACIÓN** procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Civil Núm.: SJ2018CV01565<br><br>Sobre: Ejecución de Hipoteca ("*In Rem*") |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y la Jueza Prats Palerm.

Rivera Colón, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 13 de enero de 2026.

Comparece ante nos el señor Jorge Hernández Miller (Sr. Hernández Miller o apelante) y solicita que revoquemos la Sentencia dictada, el 29 de agosto de 2025, por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI). Mediante el referido dictamen, el foro primario declaró Ha Lugar la Moción Solicitando (sic.) Continuación de los Procedimientos y en Solicitud de Sentencia; en consecuencia, ordenó la ejecución de la hipoteca.

Examinada la solicitud de autos, la totalidad del expediente y el estado de derecho aplicable, confirmamos el dictamen apelado mediante los fundamentos que expondremos a continuación.

**I.**

El caso de autos tuvo su génesis el 23 de marzo de 2018, cuando First Bank Puerto Rico (First Bank)[1] presentó una

---

[1] El 3 de noviembre de 2021, mediante una Moción en Cumplimiento de Orden, Solicitud de Sustitución de Parte Demandante y Nuevo Referido al Centro de Mediación, First Bank informó que Luna Residential, LLC (Luna o apelada)

Demanda en contra del Sr. Hernández Miller, la señora Zor Jannette Alejandro Portalatín (Sra. Alejandro Portalatín) y la sociedad legal de gananciales compuesta por ambos, sobre cobro de dinero y ejecución de hipoteca. Por medio de esta, alegó que el 30 de octubre de 2004, otorgó un pagaré hipotecario por la suma de $439,500.00, más los intereses a razón del 5 7/8% anual y otros créditos accesorios. En esta misma fecha el apelante otorgó la Escritura Núm. 1843, suscrita ante el Notario Público Luis A. Archilla Díaz, mediante la cual se constituyó una hipoteca sobre la siguiente propiedad:

> *URBANA: Solar marcado con el #57 en la Urbanización Las Flores de Montehiedra radicada en el barrio Caimito de Río Piedras, término municipal de San Juan, Puerto Rico, con una cabida de 507.2487 metros cuadrados, equivalentes a 0.1291 cuerdas. En lindes por el NORTE, con la calle Lirio de Paz en una distancia de 20.578 metros; por el SUR, con el lote #67 en una distancia de 19.198 metros; por el ESTE, con el lote #58 en una distancia de 25.449 metros; y por el OESTE, con el lote #56 en una distancia de 25.530 metros. Enclava una estructura para fines residenciales diseñada para vivienda de una familia construida conforme a planos y especificaciones aprobados por las agencias e instrumentalidades gubernamentales pertinentes. Inscrita al folio 73 del tomo 747 de Río Piedras Sur, sección IV de San Juan, finca número 21,116. Inscrita al folio 73 del tomo 747 de Río Piedras Sur, Registro de la Propiedad de San Juan, Sección IV, finca número 21,116.*

Sostuvo que el Sr. Hernández Miller incumplió con los pagos mensuales, vencidos desde el 1 de julio de 2014, hasta la presentación del pleito. Indicó que realizó múltiples requerimientos, avisos y concesión de oportunidades, para que el apelante pudiera cumplir con los pagos solicitados. Notificó que el apelante adeuda la cantidad de $370,468.09 del pago principal, los intereses a razón del 5.875%, computado desde el 1 de julio de 2014, hasta el saldo total de la deuda; más otros cargos que

---

adquirió todo interés en el préstamo objeto de este pleito. Consecuentemente, el TPI ordenó la sustitución de parte el 5 de noviembre de 2021.

incluyen una suma de $43,945.00 pactada para los gastos, costas y honorarios de abogado.

Posteriormente, el 14 de julio de 2018, el Sr. Hernández Miller presentó su Contestación a Demanda, en la cual alegó que esta propiedad constituye su hogar seguro. Por ende, tiene derecho a una mediación compulsoria para auscultar una alternativa de refinanciamiento. Además, alegó que la apelada compró el pagaré por un 7% del valor real del mismo, por lo que, se le debe reducir la cantidad adeudada.

En efecto, el 6 de agosto de 2018, el TPI refirió el caso al Centro de Mediación de Conflictos (Centro de Mediación). Una vez atendido, el Centro de Mediación presentó una Notificación al Tribunal en Casos de Ejecución de Hipoteca, el 31 de octubre de 2018.[2] En esta consignó que, el acreedor no le ofreció al apelante la orientación requerida por la Ley Núm. 184-2012, conocida como la Ley para la Mediación Compulsoria y Preservación de tu Hogar en los Procesos de Ejecuciones de Hipotecas de una Vivienda, 32 LPRA sec. 2881 *et seq.* (Ley Núm. 184-2012). Aun así, las partes desistieron del proceso de mediación.

Luego de varias instancias procesales, las cuales no detallaremos, el 21 de junio de 2021, el TPI refirió nuevamente el caso al Centro de Mediación. Sin embargo, el 14 de octubre de 2021, el Centro de Mediación presentó una Moción Informativa para Devolver el Caso al Tribunal ante el conocimiento de que el pagaré se vendió a un tercero. Indicó que, para cumplir con las exigencias de la Ley Núm. 184-2012, es necesario que estén presentes las partes directamente involucradas.

Consecuentemente, el 5 de noviembre de 2021, se volvió a referir al Centro de Mediación. Así las cosas, el 25 de mayo de 2022, se solicitó un término adicional de 90 días para completar el

---

[2] Notificado el 2 de noviembre de 2018.

procedimiento. El 22 de agosto de 2022, se solicitó nuevamente un término de 90 días para culminar el proceso de mediación. En esta misma fecha, el TPI emitió una Sentencia de Paralización hasta tanto alguna de las partes solicitara la reapertura del mismo.

Mediante una Moción Informativa sobre Resultado de Caso de Ejecución de Hipoteca Atendido Mediante Servicio de Videoconferencia, el Centro de Mediación notificó al foro primario, el 27 de febrero de 2023, que el caso fue cerrado sin acuerdo alguno. Indicó que, en su reunión de 24 de febrero de 2023, Luna le informó al Sr. Hernández Miller el resultado de la evaluación de alternativa de retención seleccionada por este.

Según indicado, el 11 de abril de 2023, Luna presentó una Moción Solicitando se Dicte Sentencia Sumaria a Favor de la Parte Demandante. Indicó que, habiendo cumplido con el asunto jurisdiccional de la vista de mediación, no existía impedimento alguno para que el foro de instancia dictara la sentencia a su favor.

En respuesta, el 5 de mayo de 2023, el Sr. Hernández Miller presentó una Oposición a que Prosiga con el Trámite del Presente Caso, Por Falta de Jurisdicción, y Solicitando se Compela a la Parte Demandante a Volver al Proceso de Mediación Compulsoria para que Negocie de Buena Fe. Alegó que, la apelada actuó de mala fe al no aceptar su oferta principal, dado a que los fondos con los que se proponía pagar lo adeudado no provenía de una cuenta bancaria perteneciente a estos. Específicamente, el apelante cuestionó el razonamiento de Luna ante el inconveniente de que los fondos no eran de su pertenencia. Además, señaló que la apelada no presentó una contra oferta.

Mediante la Réplica a Moción de Nuevo Referido a Mediación, la apelada insistió que no se le puede obligar a aceptar una cantidad menor al balance principal adeudado. Además, según la jurisprudencia aplicable, este le ofreció todas las alternativas

disponibles para las cuales el Sr. Hernández Miller cualificaba. Sobre la procedencia de fondos, aclaró que el apelante únicamente presentó una carta de pre-cualificación correspondiente a la señora Ana N. Hernández Alejandro, hija del apelante (Sra. Hernández Alejandro).

A partir de lo anterior, el 29 de enero de 2024, el Sr. Hernández Miller presentó su Oposición a "Moción a Solicitud de Continuación de los Procedimientos", y Solicitando Remedios. Argumentó que la parte ejecutante tiene que probarle al tribunal que ésta negoció de buena fe todas las alternativas disponibles al demandado para evitar la ejecución de su residencia principal. Por lo que, negar de plano una oferta, no cumple con el requisito jurisdiccional.

En desacuerdo, el 19 de abril de 2024, Luna presentó una Réplica a Oposición de Continuación de los Procedimientos en donde detalló los múltiples intentos de negociación entre las partes. Planteó que, para cumplir con los requisitos establecidos para el pago de la deuda, los fondos debían ser de su pertenencia o de un miembro que resida en la vivienda principal. Añadió que incluso se llevó a cabo el procedimiento de mitigación de pérdidas. Por lo que, cumplió cabalmente con la Ley Núm. 184-2012 y lo resuelto por nuestro Tribunal Supremo en *Scotiabank de Puerto Rico v. Rosario Ramos*, 205 DPR 537 (2020).

Citada las partes para la celebración de una vista, el 30 de abril de 2024, el foro primario otorgó otra oportunidad a las partes para alcanzar un acuerdo, de lo contrario, ordenaría la ejecución de la propiedad.[3]

Tras varios intentos infructuosos, las partes no lograron alcanzar un acuerdo transaccional. Por lo tanto, el 16 de enero de 2025, Luna presentó una Moción Solicitando Continuación de los

---

[3] Véase Minuta de 3 de mayo de 2024.

Procedimientos y en Solicitud de Sentencia. Mediante su petitorio, la apelada reiteró que cumplió a cabalidad con los requisitos establecidos en nuestro ordenamiento jurídico. Asimismo, indicó que, lo correspondiente es ejecutar la hipoteca para sufragar la deuda acumulada desde el 1 de junio de 2014.

Disconforme, el 5 de febrero de 2025, el apelante presentó su Oposición a "Moción Solicitando Continuación de los Procedimientos y en Solicitud de Sentencia", y Solicitando Remedio. Explicó que, para que el foro primario recobrara su jurisdicción, debían establecer que el ejecutante negoció de buena fe todas las alternativas posibles para retener su vivienda principal.

Ante lo cual, el 10 de febrero de 2025, Luna presentó una Réplica a Escrito en Oposición, donde expuso que en la vista llevada a cabo el 30 de abril de 2024, el foro de instancia determinó que el apelante no actuó de buena fe en el proceso de mitigación de pérdidas. Añadió que, los intentos de negociación del Sr. Hernández Miller giran en torno a extender la vigencia del préstamo hasta el 2033, distribuyendo los pagos a su conveniencia, sin explicación o evidencia que justifique estos cambios. Aclaró que, la propuesta presentada se realizó por la cantidad de $447,106.00, sujeta a la inspección de la propiedad y la evidencia de los fondos. Sin embargo, realizada la inspección, la propiedad se valoró en $772,000.00. Por lo que, el apelante se encuentra en posición de recibir el sobrante de la venta, luego de satisfacer la deuda.

Consecuentemente, el 18 de marzo de 2025, las partes fueron citadas a una vista.[4] Durante el procedimiento, se aclaró una de las propuestas realizadas por el Sr. Hernández Miller. Por su parte, Luna indicó que deben actualizar el monto de la deuda, ya

---

[4] Véase Minuta de 26 de marzo de 2025.

que corresponde a la cantidad adeudada hasta mayo de 2024. Se hizo constar que, el apelante no podía dar certeza de que obtendrá la suma solicitada para establecer un plan de pago. Ante la información dirigida hacia una posible negociación, el TPI otorgó un término de 30 días para que las partes informaran si lograron un acuerdo. Además, apercibió que deben ser razonables en cuanto a la capacidad económica del apelante *versus* el pago de la deuda reclamada.

El 30 de mayo de 2025, por tercera ocasión, Luna radicó una Moción en Solicitud de Continuación del Proceso Judicial y para que se Considere la Moción en Solicitud de Sentencia Sumaria. Informó que se remitió al apelante el balance adeudado hasta el 18 de abril de 2025. En su oferta, el Sr. Hernández Miller presentó un plan de reestructuración consistente en pagos parciales hasta el 2034. Sin embargo, este no incluyó la evidencia de la disponibilidad de fondos o de capacidad económica para cumplir con los pagos mensuales de $1,405.06, ni los (3) pagos parciales ascendientes a $98,850.84. Por su parte, Luna realizó una contra oferta, de la cual no recibió respuesta.

Seguidamente, el 16 de junio de 2025, el Sr. Hernández Miller presentó su Oposición a "Moción en Solicitud de Continuación del Proceso Judicial, Etc.", y en Solicitud de Orden. En esta detalló el tracto de la negociación y comunicaciones entre las partes. Reiteró que Luna se encuentra negociando de mala fe, toda vez que, aun con la evidencia financiera del apelante, propone pagos y mensualidades que no son razonablemente viables.

En este mismo día, el TPI emitió una Orden en la cual aclaró que el caso no podía estar paralizado de manera indefinida y a conveniencia exclusiva del apelante. Consecuentemente, otorgó un término final de cinco (5) días para que las partes realizaran una oferta que se ajuste a la realidad del mercado, de manera que no

sea injustificadamente alta ni excesivamente baja. Finalmente, de no alcanzar un acuerdo, el Sr. Hernández Miller debía consignar la cantidad de la oferta; y Luna debía justificar su denegatoria.

Luego de evaluar las posturas de ambas partes, el 25 de junio de 2025, el TPI emitió una Orden en la cual coincidió con la apelada al entender que no es razonable reestructurar un préstamo, con pagos atrasados desde el 1 de julio de 2014, a cambio de un abono de $10,000.00, con pagos globales a 2, 4 y 6 años por concepto de $98,850.84. Finalmente, le concedió un término final de 10 días al Sr. Hernández Miller para que mejorara su oferta.

Conforme a lo ordenado, el 7 de julio de 2025, el apelante presentó una Moción Informando Envío de Última Oferta de Reestructuración del Préstamo Hipotecario, en Cumplimiento de Orden, y Solicitando Señalamiento de Vista Evidenciaria en Caso de Rechazo de Esta. Detalló que, en base a esta nueva oferta el pago de la deuda consistiría en un abono inicial de $10,000.00, con pagos mensuales a razón de $1,405.06, hasta la fecha de vencimiento el 1ro de noviembre de 2034. Además, ofreció (2) pagos globales por la suma de $148,276.25 en los próximos (4) años.

En respuesta, el 30 de julio de 2025, la apelada radicó una Moción Informativa y En Solicitud de Remedio. Insistió en el rechazo de la oferta dado a que no era razonable. Especificó que el apelante no presentó la evidencia de disponibilidad de fondos. Cabe destacar que Luna no hizo una contraoferta para la reestructuración de la deuda.

Consecuentemente, el 4 de agosto de 2025, el TPI emitió una Orden en la cual estableció que las partes agotaron los esfuerzos de manera razonable bajo el ordenamiento jurídico vigente. Por ende, ordenó la continuación de los procedimientos judiciales.

Nuevamente, le otorgó un término al apelante para que exprese causa por la cual no debe dictar sentencia y ordenar la venta en pública subasta.

Por su parte, el 20 de agosto de 2025, el Sr. Hernández Miller presentó una Moción de Reconsideración, en Solicitud de Orden y/o de Vista Evidenciaria, en donde reiteró su petitorio dirigido a que el foro primario debía realizar una determinación fáctica sobre la buena fe de la apelada en las negociaciones, según las conversaciones y ofertas realizadas entre las partes. Arguyó que, de lo contrario, el TPI no podía recobrar su jurisdicción.

Mediante una Moción en Cumplimiento de Orden o Resolución, el 26 de agosto de 2025, Luna señaló que el escrito del apelante no aporta información que no haya sido analizada por el Tribunal. Sostuvo que los términos y condiciones expresados en su oferta de 5 de mayo de 2025 se mantienen vigentes y fueron reiterados en la comunicación de 23 de junio de 2025. Insistió en que el abono debía ser de $25,000.00, no de $10,000.00. Finalmente, argumentó que una vista evidenciaria tampoco aportaría información adicional a la que obra en el expediente judicial.

En esta misma fecha, el foro primario emitió un Resolución Interlocutoria en la cual hizo constar que se concedieron amplias oportunidades para que las partes realizaran las negociaciones de buena fe. Consideró que, Luna concedió oportunidades más que razonables para reestructurar la deuda. Concluyó que, las ofertas presentadas por el Sr. Hernández Miller no eran razonables, específicamente debido a su repetido y prolongado incumplimiento. Por último, otorgó un término final de 10 días para que el apelante muestre causa por la cual no se deba dictar sentencia en su contra.

Seguidamente, el 4 de septiembre de 2025, el Sr. Hernández Miller presentó su Moción Mostrando Causa y en Oposición a Moción de Sentencia Sumaria en la cual insistió que la apelada tenía conocimiento de que su contra oferta no era viable, ni mucho menos económicamente asumible. Sostuvo que el expediente demuestra que Luna procedió las negociaciones con mala fe, incumpliendo con los requisitos de nuestro ordenamiento jurídico.

Es así como el 30 de septiembre de 2025, el TPI emitió la Sentencia Final que nos ocupa. El foro primario determinó que no existía controversia sobre los siguientes hechos:

*1) Los codemandados Jorge L. Hernández Miller t/c/c Jorge Hernández Miller y su esposa Zor Janette Alejandro Portalatin t/c/c Zor J. Alejandro Portalatin son los titulares registrales de la propiedad que se describe en el párrafo tres (3) de esta Sentencia, según surge de la inscripción 3ra en el Registro de la Propiedad de San Juan, Sección IV, inscrito al folio 73 del tomo 747 de Río Piedras Sur, finca número 21,116, inscripción 3ra.*

*2) FirstBank Puerto Rico (FirstBank) advino dueña y tenedora por endoso de un Pagaré Hipotecario suscrito el día 30 de octubre de 2004, ante el Notario Público Luis A. Archilla Díaz, por la suma principal de $439,450.00, más intereses a razón del 5 7/8% anual y otros créditos accesorios – que fue originalmente expedido a favor de Doral Bank Puerto Rico.*

*3) Para garantizar el cobro del pagaré hipotecario antes mencionado, más una suma de $43,945.00 pactada para honorarios de abogado en caso de reclamación judicial, se constituyó una primera hipoteca mediante escritura número 1843, otorgada el día 30 de octubre de 2004, ante el Notario Público Luis A. Archilla Díaz (la Escritura de Hipoteca), sobre la siguiente propiedad:*

*URBANA: Solar marcado con el #57 en la Urbanización Las Flores de Montehiedra radicada en el barrio Caimito de Río Piedras, término municipal de San Juan, Puerto Rico, con una cabida de 507.2487 metros cuadrados, equivalentes a 0.1291 cuerdas. En lindes por el NORTE, con la calle Lirio de Paz en una distancia de 20.578 metros; por el SUR, con el lote #67 en una distancia de 19.198 metros; por el ESTE, con el lote #58 en una distancia de 25.449 metros; y por el OESTE, con el lote #56 en una distancia de 25.530 metros. Enclava una estructura para fines residenciales diseñada para vivienda de una familia construida conforme a planos y*

*especificaciones aprobados por las agencias e instrumentalidades gubernamentales pertinentes. Inscrita al folio 73 del tomo 747 de Río Piedras Sur, sección IV de San Juan, finca número 21,116. 6. La antes mencionada hipoteca se encuentra inscrita al folio 73 del tomo 747 de Río Piedras Sur, Registro de la Propiedad de San Juan, Sección IV, finca número 21,116, inscripción 5ta.*

*4) El pago mensual acordado en el Pagaré Hipotecario es de $2,599.51.*

*5) Desde el 1 de julio de 2014 los codemandados dejaron de pagar las mensualidades vencidas del Préstamo Hipotecario.*

*6) FirstBank hizo múltiples requerimientos de pago a los codemandados.*

*7) Ante el impago de los codemandados, y conforme lo provee la Escritura de Hipoteca, FirstBank declaró vencida la totalidad de la deuda.*

*8) Conforme a los términos y condiciones establecidos en el Pagaré Hipotecario, y en la correspondiente Escritura de Primera Hipoteca, se le adeuda al dueño y tenedor del referido Pagaré Hipotecario la suma de $370,468.09 por concepto de principal, más los intereses sobre dicha suma a razón del 5.875% anual desde el 1 de junio de 2014, hasta su completo pago, más las primas de seguro hipotecario y riesgo, recargos por demora y cualquier otra cantidad pactada en la Escritura de Primera Hipoteca, desde la fecha antes mencionada y hasta la fecha de su total pago; más la suma estipulada de $43,945.00 para gastos, costas y honorarios de abogados.*

*9) Desde el 1 de julio de 2014 las partes codemandadas no han hecho un solo pago al acreedor hipotecario; ni han abonado cantidad alguna para disminuir la deuda que se obligaron pagar en el Pagaré Hipotecario; ni han consignado cantidad alguna en el Tribunal.*

*10) Luna Residential III, LLC (Luna Residential) es el actual dueño y tenedor del Pagaré Hipotecario.*

*11) Luna Residential III, LLC no es la entidad bancaria que concedió el Préstamo; ni fue quien compareció en el correspondiente Pagaré Hipotecario y/o en la Escritura de Primera Hipoteca.*

*12) Mediante Orden del 4 de noviembre de 2021 (SUMAC 94) se ordenó sustituir a FirstBank Puerto Rico por Luna Residential III, LLC como parte demandante.*

Hizo constar que, el Sr. Hernández Miller argumentó que la única controversia existente es si el acreedor hipotecario negoció

de buena fe al recobrar su acreencia conforme a la jurisprudencia aplicable. Conforme a ello, detalló las instancias en que las partes intentaron lograr un acuerdo desde el 6 de agosto de 2018 hasta el 14 de julio de 2025. Concluyó que, Luna ofreció múltiples alternativas disponibles en el mercado para las cuales el Sr. Hernández Miller cualificaba. Por otro lado, el apelante insistía en forzar una negociación poco razonable y sin presentar evidencia alguna de su capacidad financiera para efectuar los pagos ofertados. En consecuencia, ordenó la ejecución de la propiedad en pública subasta.

Muy por el contrario, mediante la Moción de Reconsideración, el Sr. Hernández Miller insistió que el foro primario debió celebrar una vista evidenciaria previo a dictar sentencia. Ello a los fines de determinar que la apelada actuó de buena fe al ofrecer todas las alternativas viables y razonables con el objetivo de conservar la vivienda principal.

Varios días después, Luna presentó su Moción en Oposición de Reconsideración [de Sentencia], en donde arguyó que la denegatoria de una oferta no es sinónimo de mala fe. Indicó que el estado de derecho vigente requiere que la oferta sea razonable para ambas partes, no solo para la conveniencia del deudor. Además, reiteró que en la Minuta de la vista celebrada el 30 de abril de 2024, el TPI expresó que esta no actuó con mala fe. Por lo que, ya se pasó juicio sobre las negociaciones entre las partes.

Analizados los documentos de las partes, el 28 de octubre de 2025, el foro primario declaró No Ha Lugar la Solicitud de Reconsideración.

Inconforme, el apelante radicó el recurso que nos ocupa, en el cual detalló que el foro de instancia cometió el siguiente error:

> *Erró el TPI al dictar Sentencia de ejecución de la hipoteca de la residencia principal* [sic] *del apelante sin haber aún recobrado jurisdicción para poder proseguir*

*con el caso de ejecución, por no haberse aún probado que la apelada le había ofrecido al apelante una alternativa viable y de buena fe para evitar la ejecución de su residencia principal, como parte del proceso de mediación compulsoria que mandata la Ley 184-2012, conforme al caso de Scotiabank de Puerto Rico v. Rosario Ramos.*

El 8 de diciembre de 2025, emitimos una Resolución en la cual le concedimos al apelado un término a vencer el 26 de diciembre de 2025. Conforme a lo ordenado, Luna radicó su Alegato en Oposición a Recurso de Apelación.

Con el beneficio de la comparecencia de las partes, procedemos a discutir el marco legal pertinente a la controversia ante nos.

## II.

## A.

Es norma reiterada que, la sentencia sumaria es la herramienta procesal que procura la solución rápida, justa y económica de aquellos casos en los que no existen hechos materiales en controversia que ameriten la celebración de un juicio. *Soto y otros v. Sky Caterers,* 2025 TSPR 3, 215 DPR ___ (2025); *Oriental Bank v. Caballero García,* 212 DPR 678 (2023). En tal caso, la Regla 36.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.1, permite la presentación de una moción de sentencia sumaria respaldada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes. *Oriental Bank v. Perapi et al.*, 192 DPR 7, 25 (2014); *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414, 430 (2013).

Cónsono con lo anterior, la Regla 36.3(a) de Procedimiento Civil, 32 LPRA Ap. V, R. 36. 3, instaura los requisitos de forma respecto a esta moción:

*(1) Una exposición breve de las alegaciones de las partes;*

*(2) los asuntos litigiosos o en controversia;*

*(3) la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria;*

*(4) una relación concisa y organizada en párrafos enumerados, de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen los mismos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal;*

*(5) las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y*

*(6) el remedio que debe ser concedido.*

Por su parte, quien presente el escrito de oposición a la sentencia sumaria también tiene que cumplir con los requisitos de la Regla 36.3(c) de Procedimiento Civil, *supra*. A tales fines, la parte opositora puede derrotar tal solicitud si presenta un escrito que establezca la existencia de hechos esenciales[5] en controversia:

*En la oposición a una solicitud de sentencia sumaria, el promovido debe, como parte de su carga, puntualizar aquellos hechos propuestos que pretende controvertir y, si así lo desea, someter hechos materiales adicionales que alega no están en disputa y que impiden que se dicte una sentencia sumaria en su contra. Claro está, para cada uno de estos supuestos deberá hacer referencia a la prueba específica que sostiene su posición según exige la Regla 36.3. En otras palabras, la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa. León Torres v. Rivera Lebrón,* 204 DPR 20, 44 (2020); *Roldán Flores v. M. Cuebas et al.,* 199 DPR 664, 677 (2018).*

Una vez se presente la solicitud de sentencia sumaria y su respectiva oposición, el foro primario deberá: (1) analizar todos los documentos incluidos en ambas mociones y aquellos que obren en el expediente del tribunal; y (2) determinar si la parte opositora controvirtió algún hecho material o si hay alegaciones en la demanda que no han sido refutadas en forma alguna por los documentos. *Consejo Tit. v. Rocca Dev. Corp. et als.,* 25 TSPR 6,

---

[5] Según la jurisprudencia, un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *Oriental Bank v. Caballero García, supra,* a la pág. 679.

215 DPR __ (2025); *Abrams Rivera v. E.L.A.,* 178 DPR 914, 933 (2010).  En cuanto a los documentos presentados, "éstos deben verse de la forma más favorable para la parte promovida, concediéndole a ésta el beneficio de toda inferencia razonable que se pueda derivar de ellos". *Medina v. M.S. & D. Química P.R., Inc.,* 135 DPR 716, 735 (1994); *Corp. Presiding Bishop CJC of LDS v. Purcell,* 117 DPR 714, 721 (1986).

No obstante, como regla general, no es aconsejable dictar sentencia sumaria si hay asuntos de credibilidad que ameritan la celebración de un juicio.  A tales efectos, el Tribunal Supremo de Puerto Rico ha validado la aplicación de este mecanismo siempre y cuando no existan controversias esenciales sobre hechos materiales:

> *[N]o es aconsejable utilizar la moción de sentencia sumaria en casos en donde existe controversia sobre elementos subjetivos, de intención, propósitos mentales o negligencia, o cuando el factor de credibilidad es esencial y está en disputa. Soto v. Hotel Caribe Hilton, 137 DPR 294 (1994). Sin embargo, esto no impide utilizar el mecanismo de sentencia sumaria en reclamaciones que requieren elementos subjetivos o de intención —como pasa en un caso de discrimen— cuando de los documentos a ser considerados en la solicitud de sentencia sumaria surge que no existe controversia en cuanto a los hechos materiales. Ramos Pérez v. Univisión,* 178 DPR 200, 219 (2010).

Efectuado ese análisis, el tribunal podrá dictar sentencia sumaria "si queda claramente convencido de que tiene ante sí, de forma no controvertida, todos los hechos materiales pertinentes y que es innecesaria una vista en los méritos".  *Birriel Colón v. Econo y Otro,* 213 DPR 80, 91 (2023); *SLG Fernández-Bernal v. RAD-MAN et al.,* 208 DPR 310, 334 (2021).  La concesión de este recurso procede si de la prueba que acompaña a la moción surge preponderantemente la inexistencia de controversia sobre hechos medulares.  *CSM v. ELA,* 2025 TSPR 78, 216 DPR ___ (2025); *Cruz, López v. Casa Bella y otros,* 213 DPR 980, 993 (2024). Es decir, el foro primario deberá dictar sentencia sumaria cuando ante los

hechos materiales no controvertidos: (1) el promovido no puede prevalecer frente al derecho aplicable, y (2) el tribunal cuenta con la verdad de todos los hechos necesarios para resolver la controversia. *Oriental Bank v. Caballero García, supra,* a la pág. 679; *Mejías et al. v. Carrasquillo et al.*, 185 DPR 288, 299 (2012).

Por otra parte, nuestro ordenamiento jurídico procesal reconoce la sentencia sumaria por insuficiencia de prueba en aquellos casos donde la parte promovente alega que el adversario no cuenta con suficiente evidencia para prevalecer en el juicio. *Medina v. M.S. & D. Química P.R., Inc.,* supra, a la pág. 726. Bajo esta modalidad, una vez que las partes han realizado un adecuado y apropiado descubrimiento de prueba, el promovente puede solicitar la sentencia sumaria alegando insuficiencia de prueba por parte del promovido. *Íd.*

Bajo esta modalidad, en *Ramos Pérez v. Univisión*, supra se indicó que el promovente debe demostrar que: 1. la vista es innecesaria; 2. el demandante no cuenta con evidencia suficiente para probar algún hecho esencial; 3. como cuestión de derecho procede la desestimación de la reclamación.

Así, pues, para presentar una moción de sentencia sumaria por insuficiencia de prueba, se debe de haber finalizado el procedimiento de descubrimiento de prueba. Bajo este crisol doctrinario, al presentarse una moción de sentencia sumaria por insuficiencia de prueba, el promovente tiene el peso de demostrar que se ha llevado a cabo un descubrimiento de prueba completo, adecuado y apropiado. Véase *Medina v. M.S. & D. Química P.R. Inc.,* supra. Cónsono con lo anterior, para derrotar una moción de sentencia sumaria por insuficiencia de prueba, la parte promovida puede, entre otras cosas, alegar que la moción es prematura porque el descubrimiento es inadecuado, está a medias o no se ha realizado; o que éste, por su naturaleza, no es un caso que

conviene se resuelva por el mecanismo de sentencia sumaria. *Medina v. M.S. & D. Química P.R. Inc.*, supra.

Por último, si una parte resulta inconforme con el dictamen relacionado con la solicitud de sentencia sumaria tiene derecho a recurrir a la etapa apelativa. En tales circunstancias, nos encontramos en la misma posición que el foro primario al evaluar la procedencia de una sentencia sumaria. *Cruz, López v. Casa Bella y otros, supra,* a la pág. 994; *Birriel Colón v. Econo y otro, supra,* a la pág. 91. Así que, ostentamos la facultad de examinar *de novo* el expediente y aplicar los criterios que exigen la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia interpretativa. *Roldán Flores v. M. Cuebas et al.,* 199 DPR 664, 679 (2018). No obstante, nuestra autoridad revisora es limitada, pues solo podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 114-155 (2015). Esta limitación responde a que carecemos de facultad para adjudicar hechos materiales en disputa, toda vez que esa tarea corresponde al foro primario. *Íd.*; *Vera v. Dr. Bravo,* 161 DPR 308, 335 (2004).

**B.**

La Asamblea Legislativa adoptó la Ley Núm. 184-2012, supra, con el fin de proteger la residencia principal de los deudores hipotecarios ante los efectos de la crisis económica en Puerto Rico suscitada en los años 2007 al 2009. *Scotiabank de Puerto Rico v. SLG Rosario-Castro*, supra, a la pág. 547. Ésta dispone para un procedimiento de mediación compulsoria, previo a que se concrete un proceso de ejecución de hipoteca sobre dicha propiedad principal, mediante el cual se le informará al deudor aquellos remedios alternativos disponibles para mantener el bien inmueble de que se trate. *Oriental Bank v. Caballero García,* 212 DPR 671,

680-681 (2023). Todo ello con el propósito de "evitar la pérdida de su residencia principal y, a su vez, le provee la oportunidad de sentarse a negociar con su acreedor". *Bco. Santander v. Correa García*, 196 DPR 452, 461 (2016).

Aunque en su Exposición de Motivos la Ley de Mediación dispone que se entenderá que propiedad principal de vivienda es aquella que se usa como hogar principal, no *second home*, el referido estatuto también la define como "aquella que se utiliza como el hogar principal del deudor o del deudor y su familia inmediata; y que para fines contributivos sobre bienes inmuebles es aquella para la cual aplicaría la exención contributiva principal". 32 LPRA sec. 2881 (e).

En cuanto a la reunión compulsoria de mediación, la ley establece que ésta se celebrará en los casos en que un acreedor hipotecario vaya a iniciar un pleito de cobro de dinero y ejecución de hipoteca que pueda resultar en la venta judicial "de una propiedad residencial que constituya una vivienda principal". *Franklin Credit v. George Riviello*, 209 DPR 555, 564 (2022). Durante dicho cónclave, el acreedor hipotecario deberá notificarle al deudor:

> *todas las alternativas disponibles en el mercado de acuerdo al tipo de préstamo e inversionista para poder evitar la privación del inmueble al deudor, ejecución de la hipoteca o la venta judicial de una propiedad residencial que constituya una vivienda principal, incluyendo aquellas alternativas que no dependen de la capacidad económica del deudor, como lo son la venta corta ("short sale"), la dación en pago, entrega voluntaria de título, y otros remedios que eviten que el deudor pierda su hogar o que, de perderlo, se minimicen las consecuencias negativas sobre el deudor.* 32 LPRA sec. 2882.

Finalmente, la ley puntualiza que "[el] propósito u objetivo será poder llegar a un acuerdo o modificación que permita al deudor hipotecario establecer un acuerdo de pago u otra

alternativa satisfactoria a las partes y no perder su vivienda principal". 32 LPRA sec. 2881 (b).

Nuestro más alto foro determinó en *Bco. Santander v. Correa García*, supra, a la pág. 472, que la mediación compulsoria es un requisito jurisdiccional, y que las únicas excepciones son: (1) cuando el deudor esté en rebeldía o (2) cuando el tribunal haya eliminado sus alegaciones. En vista de ello, y en los casos que aplique, es obligación del tribunal referir el caso a mediación, pues de no hacerlo "no podrá dictarse Sentencia ni ordenarse la venta judicial del inmueble que se utiliza como residencia principal". *Oriental Bank v. Caballero García*, *supra*, a la pág. 681. Entiéndase que, cualquier sentencia dictada u orden de venta judicial emitida en contravención con lo establecido en la Ley Núm. 184-2012, supra, será nula y carecerá de efecto legal. *Bco. Santander v. Correa García*, *supra*, a la pág. 472.

Por otra parte, el tribunal sí está facultado para continuar los procedimientos cuando: "(1) el acreedor acudió a la vista de mediación pero el deudor no se presentó; (2) las partes acudieron a la vista y se cumplieron los requisitos de ley, pero no llegaron a un acuerdo, o (3) el deudor incumplió con los acuerdos contraídos como resultado del proceso de mediación". *Oriental Bank v. Caballero García, supra*, a la pág. 681-682. El Tribunal Supremo enfartizó que "[s]olo cuando el Tribunal de Primera Instancia se asegure de que el procedimiento de mediación compulsoria se cumplió, podrá dictar la Sentencia que proceda. *Íd.*, a la pág. 685.

De igual forma, la Ley núm. 184-2012 dispone los escenarios en los que el foro primario puede desestimar sin perjuicio la demanda instada:

> *De no presentarse el acreedor hipotecario, al procedimiento de mediación, en cualquiera de sus etapas, sin que medie justificación adecuada, o determinar el Tribunal que no se actuó de buena fe en cuanto al ofrecimiento de alternativas disponibles o la*

*evaluación realizada al deudor y luego de haber dilucidado la controversia en vista evidenciaria, el Tribunal procederá a desestimar sin perjuicio la demanda presentada. 32 LPRA sec. 2882.*

Según lo resuelto en *Scotiabank de Puerto Rico v. Rosario Ramos*, supra, a la pág. 557, el requisito de la buena fe en el proceso de la mediación se definió "en armonía con el requisito compulsorio y jurisdiccional". Para cumplir con el requisito de buena fe:

> *En primer lugar, las partes deben ir preparadas para negociar y llegar a un acuerdo, de ser posible. En segundo lugar, las partes deben llevar a la vista o al acto de mediación toda la documentación que requiere el proceso de mediación y cualquier otra documentación necesaria. En tercer lugar, el representante del acreedor hipotecario debe tener autoridad para llegar a un acuerdo. Finalmente, los acreedores deben proveer a los deudores todas las alternativas disponibles en el mercado, tales como la modificación del préstamo, un análisis en virtud de los programas federales Home Affordable Modification Program (HAMP) y Home Affordable Refinance Program (HARP), entre otras. Lo anterior, incluye aquellas alternativas que no dependen de la capacidad económica de deudor, como lo son la venta corta (short sale), dación en pago, entrega voluntaria de título, entre otras. Íd. a las págs. 557-558.*

Por lo que, la vista de mediación tiene el propósito de "evaluar la posibilidad de llegar a un acuerdo satisfactorio para ambas partes". *Íd.* a la pág. 551. Finalmente, el Tribunal Supremo aclaró que su determinación no impone una obligación hacia el acreedor para que logre un acuerdo con el fin de cumplir el proceso de mediación. *Íd.* a la pág. 558. A tenor, el objetivo es notificarle al deudor sobre las alternativas disponibles en el mercado, mediante un esfuerzo real, para evitar la ejecución de la vivienda principal del deudor. *Íd.* a la pág. 559.

### III.

Según revela el tracto procesal, la Sentencia cuya revocación se solicita fue dictada al amparo de la Regla 36 de Procedimiento Civil, *supra.* Por tanto, y de conformidad con lo resuelto por nuestro Tribunal Supremo en el caso de *Roldán Flores v. M.*

*Cuebas et al., supra,* nos compete determinar, de manera inicial, si las partes cumplieron con los requisitos necesarios que dimanan de la regla procesal antes mencionada, de modo que podamos entonces considerar las mociones presentadas.

Al examinar la Moción Solicitando Continuación de los Procedimientos y en Solicitud de Sentencia presentada por Luna, juzgamos que, ésta cumplió sustancialmente con los requisitos esbozados en la Regla 36.3 (a) de Procedimiento Civil, *supra.* En su moción incluyó una lista de hechos incontrovertidos, apoyados en el pagaré, la escritura de hipoteca, la certificación registral, entre otros documentos.

Por otro lado, la Moción Mostrando Causa y en Oposición a Moción de Sentencia Sumaria presentada por la apelante, no cumplió a cabalidad con los requisitos que le impone la Regla 36.3(b) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(b). Por un lado, el apelante cuestionó los hechos incontrovertidos propuestos por la apelada mediante la inclusión de las ofertas realizadas a la apelada, en conjunto con los estados financieros y la declaración jurada prestada por el Sr. Hernández Miller. Sin embargo, no expuso las controversias persistentes que impedían la disposición del caso sumariamente.

Superadas las formalidades de la regla, corresponde entonces verificar si el TPI dictó su Sentencia Final, sin jurisdicción, al no celebrar una vista evidenciaria donde se demostrara la buena fe de la apelada en los procesos de mediación.

Según discutimos en la exposición del derecho, la Ley Núm. 184-2012 se aprobó para crear un proceso de mediación compulsoria, previo al proceso de ejecución de hipoteca de cualquier propiedad principal de vivienda. El requisito jurisdiccional de la mediación obliga a que las partes evalúen la posibilidad de llegar a un acuerdo o modificación de pago que evite

que el deudor pierda su vivienda principal. En dicho proceso, el acreedor debe brindarle al deudor todas las alternativas disponibles en el mercado para poder evitar la ejecución de la hipoteca o venta judicial de la vivienda.

Es importante destacar, que la Ley Núm. 184-2012 requiere que, en el proceso de mediación, las partes actúen de buena fe. Incluso, el Tribunal Supremo resolvió que el requisito de buena fe es jurisdiccional, por lo que su omisión priva al tribunal para atender la controversia. Para satisfacer esta exigencia: (1) las partes deben ir preparadas para negociar y llegar a un acuerdo, de ser posible; (2) las partes deben llevar a la vista toda la documentación que requiere el proceso de mediación y cualquier documentación necesaria; (3) los acreedores deben proveer a los deudores toda las alternativas disponibles en el mercado, tales como la modificación del préstamo, un análisis en virtud de los programas federales *Home Affordable Modification Program* (HAMP) y *Home Affordable Refinance Program* (HARP). Además, se deben ofrecer aquellas alternativas que no dependan de la capacidad económica del deudor, como por ejemplo, la venta corta (short sale), dación en pago, entrega voluntaria de título, entre otras. Cabe destacar que, no existe una imposición para que el acreedor logre un acuerdo con el deudor a los fines de cumplir con el requisito de la mediación compulsoria. El objetivo es que se realice un esfuerzo real que evite la ejecución de la vivienda principal del deudor.

De entrada, cabe aclarar que, en su escrito en oposición, el apelante se limitó a señalar que el TPI no dictó la sentencia conforme a lo establecido en el caso *Scotiabank v. SLG Rosario-Castro,* supra. Ello a los fines de establecer que el acreedor no actuó con buena fe, al ofrecer todas las alternativas disponibles en el mercado para evitar la ejecución de la vivienda principal. Es

decir, nunca se presentó controversia alguna sobre la liquidez de la deuda. Específicamente, el Sr. Hernández Miller alega que se debió llevar a cabo una vista evidenciaria para que el foro primario pudiera determinar que la apelada actuó de mala fe al realizar ofertas que no eran económicamente viables para este. Además, insiste en que el TPI debió emitir una determinación fáctica sobre la buena fe, amparado en la jurisprudencia aplicable. Ante esto, argumentó que el TPI carecía de jurisdicción para dictar la sentencia.

Al evaluar el tracto procesal, surgen múltiples instancias en las que el foro primario otorgó distintas oportunidades para que las partes pudieran alcanzar un acuerdo. Hacemos constar que, el foro primario detalló en la sentencia todos los intentos o comunicaciones entre las partes en las que se demuestran la disposición para alcanzar un acuerdo, a saber:

> *6 de agosto de 2018 – Este Tribunal hizo referido al Centro de Mediación de Conflictos bajo el caso #18-493 (SUMAC 21).*
>
> *31 de octubre de 2018 - Se desistió del caso ante el Centro de Mediación de Conflictos para conceder oportunidad al entonces acreedor hipotecario (FirstBank) para orientar a los codemandados sobre la Ley 184-2012 (SUMAC 25).*
>
> *21 de junio de 2021 – Habiendo concluido los trámites apelativos, y recibido el correspondiente Mandato, este Tribunal ordenó referir el caso al Centro de Mediación y Conflictos (CMC) nuevamente (SUMAC 88).*
>
> *13 de octubre de 2021 – El CMC devolvió el caso al Tribunal por motivo de la sustitución de acreedor (FirstBank a Luna Residential) (SUMAC 91).*
>
> *4 de noviembre de 2021 – Este Tribunal ordenó la sustitución de acreedor (Luna Residential por FirstBank); y refirió el caso nuevamente al CMC (esta vez acogido bajo el caso # 22-91) (SUMAC 94).*
>
> *22 de agosto de 2022 – Este Tribunal emitió Sentencia de Paralización para conceder más tiempo al CMC para atender la controversia entre las partes (SUMAC 104).*
>
> *3 de febrero de 2023 – Los codemandados presentaron oferta al Loss Mitigation Department de Equity Mortgage para hacer un "short sale" de la propiedad por*

*$300,000.00. En apoyo, estos presentaron una Carta del Vice-Presidente de Equity Mortgage mediante la cual se precualificó a la hija del Sr. Jorge Hernández Miller, y quien sería codeudora de dicho Préstamo Hipotecario.*

*22 de febrero de 2023 – El Departamento de Mitigación de Pérdidas de Planet Home Lending y/o Equity Mortgage denegó como INACEPTABLE la oferta de "short sale" y notificó la siguiente razón: "procedencia de fondos NO proviene de una cuenta bancaria de los deudores".*

*27 de febrero de 2023 – El CMC cerró el caso # 22-91: SIN ACUERDO (SUMAC 109).*

*23 de mayo de 2023 – Los codemandados ofrecieron varias alternativas para saldar la totalidad de la deuda. Entre dichas alternativas, propusieron un Plan de Pago; refinanciar y/o reestructurar el Préstamo Hipotecario; incluir a su hija como codeudora solidaria; y acordar un precio reducido de $300,000.00 para saldar la totalidad de la deuda.*

*23 de mayo de 2023 – Luna Residential le envió al Sr. Jorge L. Hernández Miller el Formulario "Loss Mitigation Welcome Package" para que lo completara. Además, solicitó evidencia de que la hija del Sr. Jorge Hernández Miller reside en la propiedad que garantiza el Préstamo Hipotecario.*

*9 de agosto de 2023 – Planet Home Lending y/o Equity Mortgage denegaron el "Loss Mitigation" por falta de presentación de documentos y/o documentos incompletos – entre ellos los Estados Financieros de los codemandados.*

*10 de agosto de 2023 – Planet Home Lending asignó el caso a un procesador de mitigación de pérdidas.*

*18 de septiembre de 2023 – La parte demandada presentó una contraoferta tipo "Short-Payoff" la cual fue denegada sin considerar - por no cumplir con las regulaciones aplicables a las instituciones financieras. Según explicado por Luna Residential, la oferta podría ser considerada si los codemandados lograban evidenciar la disponibilidad de los fondos ofertados. En dicha ocasión el Sr. Jorge L. Hernández Miller argumentó que las regulaciones reclamadas por Luna Residential no aplican al crédito que esta reclama en su contra.*

*30 de abril de 2024 – Se celebró Vista Transaccional ante el Tribunal (SUMAC 133). En dicha ocasión el codemandado Sr. Hernández Miller informó que estaba en proceso de solicitar un refinanciamiento para el Préstamo Hipotecario. Ante tal información, se le invitó a consignar el pago mensual de la hipoteca ($2,400.00) mientras se procesaba su solicitud de refinanciamiento.*

*28 de mayo de 2024 – Los codemandados ofrecieron saldar la totalidad de la deuda de $638,723.75 (al 31*

*de mayo de 2024) mediante el pago mensual de $1,405.06 hasta saldar los $387,909.86 adeudados por concepto de Principal e Intereses, conforme al término original del Pagaré. En torno a las cantidades dejadas de pagar ("amounts in arrears and related expenses incurred on the loan") los codemandados ofrecieron saldar dicha cantidad ($268,255.66) mediante tres (3) pagos englobados ("balloon payments") de $89,418.55 cada uno – comenzando el 1 de julio de 2027; el segundo el 1 de julio de 2030; y el tercero el 1 de julio de 2033. Para asegurar el financiamiento que les permitiría hacer los pagos ofertados, la hija de los codemandados estaría garantizando la deuda de manera subsidiaria.*

*7 de agosto de 2024 – Luna Residential presentó Moción (SUMAC 138) para informar que:*

> *"2. …los términos propuestos por el demandado HERNANDEZ MILLER no son aceptables tal y como fueron propuestos por incluir una restructuración de los términos del préstamo que en este momento no son aceptables.*
> *3. Luna está en disposición de considerar el que se haga una propuesta en un solo pago, el que estaría sujeto a la inspección interior de la propiedad de manera que se pueda hacer una determinación del valor, en comparación con la suma total a ser propuesta."*

*9 de septiembre de 2024 – Los codemandados presentaron oferta de "short-payoff" por $447,106.00.*

*11 de septiembre de 2024 – Luna Residential requirió a los codemandados evidencia de fondos o, al menos, evidencia de Pre-Aprobación Financiera para el Short-Payoff por $447,106.00 propuesto por los codemandados. Luna también requirió una Opinión de Valor sobre la propiedad para poder evaluar la propuesta de los codemandados.*

*11 de octubre de 2024 – La oferta de "short-payoff" fue denegada por falta de evidencia sobre disponibilidad de los fondos - ya fuera en una cuenta bancaria o, al menos, mediante prueba de que los codemandados estaban pre-aprobados para financiar la cantidad ofertada. En dicha ocasión Luna Residential orientó a los codemandados sobre cinco (5) alternativas; y les informó sobre el Fondo de Asistencia al Propietario del Departamento de Vivienda Federal (HAF por sus siglas en inglés).*

*18 de octubre de 2024 – Los codemandados proveen la información solicitada para poder llevar a cabo la Opinion de Valor sobre la propiedad. En torno a la evidencia de fondos requerida por Luna para evaluar la propuesta del Short-Payoff por $447,106.00, los codemandados solicitaron hasta el 31 de octubre de 2024 para someter evidencia de la Pre-Aprobación del correspondiente financiamiento – toda vez que la hija de los codemandados estaría co-firmando dicho Préstamo.*

*18 de marzo de 2025 – El Tribunal celebró Vista (SUMAC 159) donde se auscultó la posibilidad de reestructurar el Préstamo Hipotecario. En dicha ocasión las partes informaron que había una propuesta que ya se había sometido por la parte demandada que no estaba clara para la parte demandante, a los efectos de una reestructuración de los atrasos y continuar realizando los pagos regulares al préstamo hipotecario hasta su vencimiento.*

*Por su parte, Luna Residential informó que les solicitó a los codemandados una cantidad para abonar a la deuda y poder reestructurar ese acuerdo de pago que no estaba contemplado dentro de la propuesta que se remitió. Según explicó Luna, no habría que hacer escrituras y no habría gastos de cierre, porque la intención es tratar de evitar a los codemandados que incurran en gastos adicionales como sería el obtener financiamiento con otra institución bancaria que sería mucho más de lo que se está requiriendo en abono al acuerdo. En dicha ocasión los codemandados informaron que no estaban en posición de confirmar si van a tener el dinero que se le ha solicitado para establecer el acuerdo de pago disponible; y solicitaron que se actualizara el balance de cancelación para trabajar la nueva reestructuración.*

*18 de abril de 2025 – Los codemandados ofrecieron saldar la deuda de $667,020.60 mediante una reestructuración. Para ello, ofrecieron lo siguiente:*

*1) hacer un pago inicial ("down payment") de $10,000.00 que se abonaría directamente al balance de la deuda;*

*2) comenzar a pagar las mensualidades originales del préstamo ($1,405.06) hasta cubrir la cantidad total adeudada por concepto de PRINCIPAL ($370,468.09) dentro del término original del préstamo; y*

*3) pagar la cantidad total de atrasos ("arreas") y gastos incurridos en el Préstamo en tres pagos englobados ("balloon payments") de $98,850.84 cada uno; respectivamente el 1 de julio de 2028; 1 de julio de 2031; y 1 de julio de 2034.*

*5 de mayo de 2025 – La oferta de reestructuración del 18 de abril de 2025 fue rechazada por Luna Residential bajo el fundamento de que el pago inicial ("down payment") ofrecido de $10,000.00 no es razonable al compararse con los atrasos pendientes al préstamo y al ingreso mensual informado por el deudor ("is not reasonable, when compared to the outstanding loan arrears and to Debtor's disclosed monthly income"). Así las cosas, Luna presentó contraoferta para que, como pre-requisito para modificar el Préstamo Hipotecario, se paguen $25,000.00 de pago inicial ("down payment").*

*20 de junio de 2025 – Los codemandados presentaron Moción (SUMAC 166) mediante la cual representan haber sometido: "una propuesta de reestructuración modificada con respecto a la última que se le había cursado [a Luna Residential], y en la cual se acortan significativamente los plazos propuestos para el pago de las sumas en atrasos ("arrears") del préstamo, mientras se asumen los pagos mensuales del préstamo hasta su saldo total, para que éste pueda analizar dicha propuesta modificada con su cliente".*

*24 de junio de 2025 – Luna Residential informó, mediante Moción (SUMAC 168), que rechazó la propuesta anterior (18 de abril de 2025) y la del 20 de junio de 2025, por entender que: "no es razonable restructurar un préstamo con pagos atrasados desde el 1 de julio de 2014, hace 11 años, con balance de $667,020.60 al 18 de abril de 2025, a cambio de un abono de $10,000.00, con pagos globales a 2, 4 y 6 años".*

*7 de julio de 2025 – Los codemandados presentaron la siguiente oferta. Por tratarse de la más reciente oferta, la citamos en su totalidad, y en su idioma original:*
> *"Mr. Hernández proposes to pay all the money owed to your client, as follows: - Mr. Hernandez would accept to enter a Joint Motion with your client whereby the Court could enter a Consent Judgment in which the totality of the amounts owed your client as per the latest payout statement would be adjudges as owed by him, $667,020.60, payable under the terms and conditions specified therein, and which could only be enforced if Mr. Hernandez defaults on his obligations of payment. –*
>
> *The terms and conditions for the repayment of the amount owed are as follows: -*
> *1- Within 5 days from the date that the Court accepts the Joint Motion to be filed by both parties and enter the corresponding Consent Judgement, Mr. Hernandez will tender to you, as agent for your client, an Official Check for $10,000.00, to be credited against the total amount due, reducing the amount owed to $657,020.60.*
>
> *2- Mr. Hernández will commence paying the original monthly payment on the loan ($1,405.06), commencing 30 days after the entering of the Consent Judgement, and each month thereafter, until the amount owed for principal ($370,468.09) is fully paid as per the original loan's term.*
>
> *3- Mr. Hernández will also pay the total amount of the arrears and related expenses incurred on the loan, ($296,552.51), 1 in two (2) equal balloon payments of ($148,276.25) each, the first payable on August 1, 2027, and the second one on August 1, 2029."*

> *14 de julio de 2025 – Luna Residential contestó, en lo aquí pertinente, lo siguiente. Por tratarse de la más reciente respuesta, la citamos en su totalidad, y en su idioma original:*
>
>> *"Luna hereby rejects the July 7, 2025 offer. As informed to the Court at SUMAC #168, Debtor's down payment of $10,000.00 to reinstate the loan, and proposed amortization payments are not reasonable, considering that Debtor's last payment date was 11 years ago, July 1, 2014, and the outstanding debt, which was $667,020. 60, as of April 18, 2025."*

Cabe agregar que, durante el proceso de mediación compulsoria, se presentaron (2) mociones de prórroga en las que se solicitó la extensión del término para culminar las negociaciones. Específicamente en su primera solicitud, de 25 de mayo de 2022, consta lo siguiente:

> *3. El 13 de abril de 2022, las partes que asistieron, con el interés de poder resolver y considerando que la Sra. Zor Alejandro Portalatín es parte indispensable para la discusión de las alternativas permanentes del Programa de "Loss Mitigation," accedieron a que se citara nuevamente para el 11 de mayo de 2022.*
>
> *4. El 11 de mayo de 2022 asistieron la Sra. Edda Juarbe Grajales en representación de la parte demandante y por la parte demandada asistió en Sr. Jorge L. Hernández Miller; no asistió ni se excusó la señora Alejandro Portalatín. En esta ocasión el único demandado que asistió fue orientado por la representante de Luna Residential III, LLC sobre las alternativas no permanentes.*
>
> *5. El señor Hernández Miller, demandado, solicitó discutir alternativas ofrecidas con su representante legal.*

Consecuentemente, en la notificación sobre el resultado del proceso de mediación, emitida el 27 de febrero de 2023, se desprende que:

> *5. El caso continuó en mediación y en la reunión del 24 de febrero de 2023 el acreedor informó el resultado de la evaluación de la alternativa de retención que interesaba el deudor.*
>
> *6. Se informa al Tribunal que el caso fue cerrado sin acuerdo.*

De esta misma forma, el expediente revela (2) instancias en las que el TPI pudo auscultar sobre los esfuerzos de la apelada

dirigidos a una negociación de buena fe.[6] Igualmente surgen al menos (3) ocasiones en las que el foro primario ordenó la comunicación telefónica entre las partes, en una cuestión de horas, para clarificar o promover la resolución de controversias en las negociaciones. Las múltiples ofertas, requerimientos y cumplimientos de órdenes, realizadas por el acreedor han demostrado un ejercicio de buena fe, incluso en los procesos posteriores a la mediación.

Luego de un exhaustivo análisis de los documentos presentados, se desprende que Luna en todo momento fue diligente y activo con el caso de autos. Desde el momento en que la apelada presentó la Demanda hasta la celebración de las vistas de mediación. Lo anterior quedó debidamente evidenciado mediante sus mociones, en las contestaciones en cumplimiento de órdenes del TPI y las múltiples comunicaciones y ofertas intercambiadas entre las partes.

El caso de marras está permeado de los intendos de la apelada a los fines de lograr una negociación de buena fe. Es decir, el TPI no esta ante un expediente huérfano de evidencia. Sino que, el tracto procesal revela las distintas circunstancias en las que el juzgador de instancia estuvo informado sobre los esfuerzos de las partes. Inclusive, así surge de su sentencia en cuanto a la cualificación del apelante para las alternativas disponibles en el mercado, tales como: *Loss Mitigation*, reestructuración del préstamo hipotecario; modificación del préstamo hipotecario; Short-Sale; Short-Payoff; y Fondo de Asistencia al Propietario del Departamento de Vivienda Federal (HAF). Igualmente, sobre las alternativas como *Home Affordable Modification Program* (HAMP) y

---

[6] Véase Minuta de 3 de mayo de 2024 y Resolución Interlocutoria de 26 de agosto de 2025.

el *Home Affordable Refinance Program* (HARP), las cuales expiraron en 2016-2018, respectivamente.

De conformidad con lo antes discutido, colegimos que el TPI no erró al dictar sentencia sumariamente, pues del expediente surge que Luna cumplió con el requisito de buena fe en el proceso de mediación compulsoria.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte de esta Sentencia, *confirmamos* el dictamen emitido por el Tribunal de Primera Instancia, Sala Superior de San Juan.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones